UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBECCA CASH,

        Plaintiff,

v.                                            Case No. 4:03-cv-53

CNA GROUP LIFE ASSURANCE                Hon. Wendell A. Miles
COMPANY,

        Defendant.
_____/

## OPINION AND ORDER

Plaintiff, Rebecca Cash ("Plaintiff" or "Ms. Cash"), filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. claiming that Defendant, Continental Casualty Company ("Defendant" or "Continental")[1], wrongfully denied her claim for disability benefits. 29 U.S.C. § 1132(a)(1)(B). Plaintiff alleges that she is totally disabled due to Chronic Fatigue Syndrome ("CFS"). This matter is now before the court on Defendant's Motion for Judgment on the Merits (Dkt. #10), Plaintiff's Motion for Judgment on the Merits (Dkt. # 24), and Defendant's Motion to Strike Exhibit A to the Supplemental Brief of Plaintiff (Dkt. # 42). For the reasons that follow, the court denies Plaintiff's Motion for Judgment on the Merits, denies Defendant's Motion to Strike, and Grant's Defendant's Motion for Judgment on the Merits.

---

[1] Continental Casualty Company was incorrectly identified in the Complaint as CNA Group Life Assurance Company. However, Continental Casualty Company has been served, and filed its Answer and its present motion for judgment on the merits.

Background

Plaintiff was employed by Archway Cookie Company ("Archway") as an accounts receivable coordinator, and was covered by Archway's short and long-term disability benefits plan, governed by ERISA and administered by Continental. Her employment required seven hours of sitting and one hour of standing or walking per day, and approximately fifteen minutes a week of lifting weight up to thirty-five pounds. (AR. 257-258). The Archway disability plan contained the following provisions:

> *"Disability"* means that during the *Elimination Period* and the following 24 months, *Injury or Sickness*, causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1.  continuously unable to perform the *Material and Substantial Duties of Your Regular Occupation;* and
>
> 2.  not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

After the *Monthly Benefit* has been payable for 24 months, *"Disability"* means that *Injury* or *Sickness* causes physical impairment to such a degree of severity that *You* are:

> 1.  continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
>
> 2.  not working for wages in any occupation for which *You* are or become qualified by education, training or experience. (AR. 38).

An employee is determined to be disabled for the first twenty-four months under the "own occupation" test, and afterwards under the "any occupation" test. An employee is also required to submit objective medical findings that support his or her disabling condition, including tests, procedures or clinical examinations, and evidence of the extent of disability, including restrictions and limitations. (AR. 43-44).

2

While at work in March 2001, Plaintiff experienced a seizure of undermined cause. Plaintiff subsequently applied for short-term disability benefits. On her claim form, Plaintiff stated her disability as "allergic reaction to sulfa drug/viral paralysis," and the diagnosis of the signing physician, Dr. Lombardi, was "Post Viral Weakness." (AR 277). Defendant initially conditionally approved her claim, noting "[a]s there is some indication that further treatment of your condition may be necessary before you can return to work, your claim remains under investigation." (AR 267). Defendant paid benefits to Plaintiff for six months. Defendant concluded that the medical evidence did not support a finding that Plaintiff was unable to perform her sedentary work with Archway Cookie Company, and on January 25, 2002, denied her claim as to further benefits. On April 12, 2002, this decision was upheld.

The medical evidence Plaintiff relies upon begins in March 2001. While at work, Plaintiff suffered a seizure-like episode where her muscles began twitching and jerking (AR. 113). She was taken to the emergency room at Battle Creek Health Systems and the episode was diagnosed as a possible allergic reaction to prescribed medicine Plaintiff was prescribed for a sinus infection. She was directed to stop the medication originally prescribed, given a new prescription and advised to take over- the- counter Benadryl for two days, and follow up with her treating physician. (AR. 98). On March 30, 2001, she returned to the emergency room with complaints of tremors, and difficulty walking and speaking. Her medication was changed again. (AR. 81). The following day, Plaintiff felt "totally dysfunctional" and was taken to Bronson Hospital in Kalamazoo, Michigan. Tests in the emergency room did not reveal the reason for Plaintiff's problems, and she was admitted to the hospital for additional tests. (AR. 81-82). She was released on April 4, 2001, with no specific diagnosis.

Plaintiff returned to the Battle Creek Health Systems on April 10, 2001, complaining of severe weakness, chest pressure, shortness of breath and slow heart rate.  It was noted that during the past year she had a poor appetite and weight loss; had been feeling stress and not sleeping well; and had some problems with intermittent dizziness.  (AR 231).  A chest x-ray showed evidence of chronic obstructive pulmonary disease, but no infiltrate.  A CT scan was normal.  The doctor recommended that she concentrate on better nutrition and physical therapy.  (AR 232).  Her muscle strength, reflexes, sensations, and central nervous system tests were within normal limits.  (AR. 232).   After examining Plaintiff, Dr. B. D. Campbell's impression was neurasthenia, possible viral syndrome, anorexia, and syncopal episode, probably vasovagal.  Dr. Campbell wrote, "[t]he patient does not seem to have a primary neurological problem at this point.  Her muscle strength, reflexes, sensations, central nervous system testing all seem to be within normal limits."   The doctor concluded that her overall feeling of weakness was probably caused by her underlying poor nutritional state, and possibly her recent viral syndrome or an allergic reaction to medication.  She was released the following day in stable condition with her symptoms significantly improved.  (AR 230).  On April 23, 2001, her primary physician, Dr. Lombardi, reported that Plaintiff had post viral weakness, could return to work on April 30, 2001, and could resume her full duties.  (AR 277).

On July 3, 2001, Nurse Judy Cagle spoke to Dr. Lombardi and reported that the doctor was unable to find a physical cause for Plaintiff's symptoms.  Dr. Lombardi informed her that while Plaintiff was hospitalized she was evaluated by Dr. Tantanini, a psychiatrist, who diagnosed depression.  Plaintiff and her husband were unable to accept this diagnosis.  Dr. Lombardi had referred Plaintiff to the University of Michigan Department of Neurology.  The

doctor believed that the evaluation at University of Michigan should establish a diagnosis of depression versus a rare neurological disorder. (AR 181).

Plaintiff was evaluated at the University of Michigan on July 23, 2001. Plaintiff reported that she had suffered no further seizure-like episodes, that her strength had improved, but she continued to have chronic fatigue. (AR 113). Plaintiff also reported she did not have fevers, weight loss, or significant URI symptoms. (AR. 252). Her neurological examination was normal. Her coordination and sensation was intact, and she was able to heel, toe and tandem walk without difficulty. (AR. 253). A review of her systems was negative for double vision, headaches, or urinary incontinence. (AR 252). Epstein-Barr virus titers were performed to evaluate for possible infectious mononucleosis. The titers were elevated, which caused the doctor to conclude that "this may explain her initial viral symptoms and fatigue, although we do not have an explanation for the spells which occurred. Infectious mononucleosis can cause malaise, which is usually self-limiting, but in some patients can last for months." (AR 113). Dr. Peltier also discussed with Plaintiff the doctor's opinion that a significant amount of her symptoms were secondary to possible depression, and she was given a prescription for Prozac. (AR 253).

On October 19, 2001, Plaintiff reported that she was always tired despite sleeping 14-16 hours a day, and that she has pain in her entire body if she tried to walk or stand too long. She was taking Zoloft and Tylenol. Plaintiff stated that she could talk on the telephone 2 or 3 times per week for short periods, could prepare small meals for herself, and could bathe herself 2 or 3 times per week. She could no longer drive, play video games or read, and only left the house for doctor's appointments. (AR. 228). On October 24, 2001, Plaintiff reported to Dr. Lombardi that

5

she felt she was getting a little better, and her husband reported that she was beginning to participate in some of the activities she normally did before her illness developed. (AR 123). The doctor indicated that Plaintiff's malaise, fatigue, and depression had significantly improved with Zoloft, but that she still had post viral weakness. (AR. 123). Dr. Lombardi encouraged Plaintiff to try and get back to her normal lifestyle. (AR 123).

Between November 6 and November 8, 2001, Plaintiff was the subject of a surveillance, although Plaintiff was never observed by the investigator. (AR. 131-134). On November 9, 2001, Plaintiff was interviewed at her home by an investigator. Plaintiff reported that she felt sick and weak, experienced "crampy muscles," and was too tired to leave the house. (AR. 142-143). She was able to walk, feed herself, and occasionally do light housework for a short time. (AR 143). Dr. Lombardi reported on November 12, 2001, that Plaintiff had severe fatigue, and was not able to return to work regardless of the occupation. (AR 120 - 121).

In December 2001, Defendant's consulting physician, Dr. Truchelut, reviewed the medical records Plaintiff had submitted. The doctor noted that additional testing was recommended, but there was no evidence that these tests were performed. Dr. Truchelut concluded that the medical information did not support a physical condition beyond September 22, 2001, that would prevent Plaintiff from returning to sedentary work. (AR 115-116). After issuing his report, Dr. Truchelut spoke with Dr. Lombardi. Dr. Lombardi reported to Dr. Truchelut that Plaintiff had "no obvious physical or laboratory abnormalities to explain her subjective complaints," (AR 114), and that extensive diagnostic testing had been fruitless. (AR 114). There was "no evidence of a viral or other medical etiology for her 'baffling' symptoms and reduced activity." (AR 114). Dr. Lombardi doubted that her present problems were related

6

to medication she had taken, and his impression was that she was suffering from depression and "significant psychiatric issues." (AR 114). Although he had urged her to seek attention for her psychiatric issues, she had continually refused. (AR. 114). After his conversation with Dr. Lombardi, Dr. Truchelut reported that he had not changed his impression as "there does not seem to be any additional information in the medical record which would support a marked functional impairment, at least from a physical perspective." (AR. 114). Dr. Truchelut later received and reviewed the letter from Dr. Peltier regarding Plaintiff's evaluation at the University of Michigan, which was discussed above, showing a normal neurological examination; intact coordination and sensation; no difficulty with heel/toe and tandem walking; and negative for double vision, headaches, urinary incontinence, fever or weight loss (AR. 252-253). Truchelut did not change his initial opinion. (AR. 111).

Plaintiff was notified on January 25, 2002, that her claim for benefits had been denied. (AR. 65). The letter cited that Plaintiff's depression had improved with Zoloft, that her neurological examination was normal, and that although Dr. Peltier reported the elevated Epstein-Barr titers there was no further information provided. (AR. 65-67). The letter also noted that according to Plaintiff's 14-day activity log, she was able to care for herself, make limited meals, do the laundry, care for her dog and cat, and exercise with Therabands and weights. (AR. 65).

Plaintiff appealed the decision and submitted a letter from Dr. Lombardi dated February 4, 2002, in which Dr. Lombardi stated that Plaintiff "most likely has a diagnosis of chronic fatigue syndrome with depression. I have no proof that she has or has had any problems with serum sickness." (AR. 92). She also submitted Dr. Peltier's letter that had been reviewed

7

by Dr. Truchelut; records from Battle Creek Health Systems for March 29 and 30, 2001; and laboratory results from August 3, 2001. (AR. 94). The newly submitted evidence was reviewed by Nurse Joyce Lee. Nurse Lee noted that there were no additional findings or reevaluations from the University of Michigan to support a diagnosis of chronic fatigue syndrome. Nurse Lee concluded that the additional information did not support a physical impairment beyond September 22, 2001, that would preclude Plaintiff from sedentary work. (AR. 95).

Plaintiff was notified on April 12, 2002, that her medical file had been reviewed again along with the new medical evidence, and it was determined that Defendant's decision to deny benefits was correct. (AR. 60). The notice stated that "the medical evidence fails to substantiate any functional impairment" that would prevent Plaintiff from returning to her previous occupation with any employer. (AR. 61). Plaintiff filed her complaint in this court on February 24, 2003.

## Standard of Review

The court reviews the denial of benefits under a de novo standard "unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989), in which case the court uses the arbitrary and capricious standard of review. Id. at 110-112. The parties agree that the arbitrary and capricious standard is applicable in this case. The arbitrary and capricious standard is the "least demanding form of judicial review of administrative action." McDonald v. Western-Southern Life Ins. Co., 347 F. 3d 161, 169 (6th Cir. 2003). If there is a reasonable explanation for the administrator's decision to deny benefits in light of the plan's provisions, then the decision is not arbitrary and capricious.

Williams v. Int'l Paper Co., 227 F. 3d 706, 712 (6th Cir. 2000).

### Discussion

Plaintiff contends that the Defendant's decision to deny disability benefits was arbitrary and capricious because Defendant relied on the opinion of its consulting physician, Dr. Truchelut, who had never examined Plaintiff and disregarded the conclusions of Plaintiff's treating physicians. Plaintiff acknowledges that the Defendant is not obligated to accord special deference to the opinions of treating physicians, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003); McDonald v. Western-Southern Life Ins., 347 F. 3d 161, 169 (6th Cir. 2003), but argues that a treating physician's opinion may not be disregarded where there is no rational basis for doing so. In Black & Decker, the Supreme Court held that although a plan administrator may not arbitrarily refuse to credit the opinion of a treating physician, the opinion of a treating physician is not entitled to any special weight, nor is a plan administrator required to specifically address such opinions when making its determination. Id. at 831. On April 23, 2001, Dr. Lombardi, reported that Plaintiff had post viral weakness, could return to work on April 30, 2001, and could resume her full duties. (AR 277). On July 3, 2001, Dr. Lombardi reported that he was unable to find a physical cause for Plaintiff's complaints. On October 24, 2001, the doctor indicated that Plaintiff's malaise, fatigue, and depression had significantly improved with Zoloft, but that she still had post viral weakness. (AR. 123). Dr. Lombardi encouraged Plaintiff to try and get back to her normal lifestyle, (AR 123), which indicates that Dr. Lombardi believed Plaintiff was physically able to resume her normal lifestyle.

Dr. Lombardi reported to Dr. Truchelut that Plaintiff had no laboratory abnormalities to

9

explain her complaints, and there was no evidence of a viral or medical etiology for her symptoms and reduced activity. (AR 114). Dr. Lombardi doubted that her present problems were related to medication she had taken, which was the initial diagnosis, and his impression was that she was suffering from depression and "significant psychiatric issues" (AR 114). In neither his written reports nor his conversation with Dr. Truchelut did Dr. Lombardi state that he believed Plaintiff was disabled, nor could his reports be construed as supporting such a conclusion. Thus, Dr. Truchelut did not reject Dr. Lombardi's opinions; Dr. Lombardi's statements simply did not support a finding of disability.

By letter dated February 4, 2002, Dr. Lombardi stated that Plaintiff "most likely has a diagnosis of chronic fatigue syndrome with depression. I have no proof that she has or has had any problems with serum sickness." (AR. 92). Nurse Lee reviewed the letter during the appeals process and concluded it did not support a finding of disability. Again, Nurse Lee did not reject an opinion by Dr. Lombardi, as the doctor merely speculated that Plaintiff "most likely" has chronic fatigue syndrome. Nowhere in the letter or his conversation with Dr. Truchelut did Dr. Lombardi state that Plaintiff could not perform her sedentary job, as required under the policy. In addition, Dr. Lombardi acknowledged that no objective diagnostic tests corroborated his diagnosis of "most likely" chronic fatigue syndrome, which appears to be based solely on Plaintiff's subjective complaints.

Dr. Campbell, who treated Plaintiff at the Battle Creek Health Systems in April 2001, ruled out a neurological problem and concluded that Plaintiff's feeling of weakness was probably caused by her underlying poor nutritional state, and possibly her recent viral syndrome or an allergic reaction to medication. Dr. Campbell did not address whether, based upon his findings,

10

Plaintiff was disabled. However, all tests were within normal limits, and Plaintiff's reported "feeling of weakness" was again based upon Plaintiff's subjective complaints.

Plaintiff's neurological examination at the University of Michigan was normal, and a review of her systems was negative for double vision, headaches, or urinary incontinence. The elevated Epstein-Barr virus titers suggested to the doctor that "this may explain her initial viral symptoms and fatigue, although we do not have an explanation for the spells which occurred. Infectious mononucleosis can cause malaise, which is usually self-limiting, but in some patients can last for months." The doctor opined that a significant amount of Plaintiff's symptoms were secondary to possible depression, and Plaintiff was given a prescription for Prozac. The University of Michigan doctors did not address the issue of disability.

Based solely upon the medical records available to Defendant, which lacked significant objective evidence of a disabling condition, it was not unreasonable to deny Plaintiff disability benefits. In addition, Plaintiff's treating physicians either did not conclude that Plaintiff was disabled from sedentary work or were silent on the issue. The court does not find that Defendant's decision, based upon the record before it, was arbitrary and capricious.

In her motion, Plaintiff raised a due process issue, claiming that she had wanted to submit additional medical evidence to Defendant. Defendant informed her that it would obtain the additional evidence she had brought to Defendant's attention, and then failed to do so. The court permitted Plaintiff to submit these additional medical records, and permitted both parties to supplement the record with medical opinion pertaining solely to the additional evidence from the University of Michigan Medical Center Neurology Department. Plaintiff submitted additional records from Battle Creek Health Systems, Bronson Hospital, Southwest Rehab Hospital; more

complete blood test results; and a letter dated January 2002, addressed to Dr. Lombardi from Dr. Peltier of the University of Michigan.

Blood tests performed on April 9, 2001, showed a normal chemistry except a low "calc osm" and a high "Cortisol." On October 6, 2003, chemistries were normal, and on May 21, 2004, serologies were negative. The additional records from Plaintiff's admission at the Bronson Hospital emergency room on March 31, 2001, show that her vital signs were stable, and a CT scan of her brain and an electrocardiogram were normal. Her standing and walking were guarded and cautious, but she was able to ambulate without any difficulty; tandem and heel and toe walking were normal, and there were no signs of a serious neurological condition. (Supplemental administrative record "SAR" 345). Doctors believed Plaintiff was having an anxiety reaction and intended to release her. However, as she was about to leave the hospital she collapsed because of weakness in her legs. (SAR. 353).

Plaintiff was examined at the Southwest Rehab Hospital on April 9, 2001. Her range of motion in upper and lower extremities was within normal limits, while her balance and gait were deficient. (SAR. 300). She received physical therapy from April 25, 2001 to August 15, 2001. (SAR. 296). On May 14, 2001, the therapist reported that Plaintiff was showing a good increase in strength and endurance and required less rest during the session. (SAR. 302). At discharge she was able to do slightly less than one-half her body weight for leg squats and was able to do other exercises. She achieved her short-term goal for therapeutic exercise tolerance, and could walk a distance of 500 feet (AR. 296).

On January 22, 2002, Plaintiff was examined a second time at the University of Michigan Neurology Department. The examination revealed that her mental status was intact; motor

examination showed 5/5 strength with normal tone and bulk; deep tendon reflexes were brisk; toes were downgoing; coordination was intact; and, she was able to walk with a narrow, casual gait as well as heel, toe and tandem walk. She did have some tenderness over the tendon in her right upper arm. The doctors opined that Plaintiff's symptoms were consistent with a chronic fatigue syndrome but, because this was not the doctors' area of expertise, Plaintiff was advised to follow up with Dr. Lombardi. The doctors reiterated that it was possible that Plaintiff's symptoms were related to the Epstein Barr virus or other viral infection. (AR. 324).

Plaintiff submitted a letter from Dr. Lombardi dated April 29, 2005, addressing the report from the University of Michigan which stated it was his "strong clinical diagnosis" that Plaintiff suffered from Chronic Fatigue Syndrome ("CFS"). He noted her persistent lethargy, fatigue and muscle aches, and that her medical records revealed no other medical condition to explain her problems. (Plaintiff's Exhibit A to Supplemental Record). Dr. Lombardi included information about CFS from the Center for Disease Control's website, which explains that it is possible that CFS "may have multiple causes" and "some viruses or other infectious agents might have a contributory role for a subset of CFS cases." (Id.).

Defendant submitted all of this additional evidence to Dr. Tanya Lumpkins for an independent review. Dr. Lumpkins concluded that, based upon this medical evidence, from August 15, 2001 to the present it could be expected that Plaintiff was physically capable of conducting the normal activities of daily living and performing a sedentary job with an option to change positions.

This additional evidence that Defendant apparently agreed to obtain and did not, adds nothing of significance in support of Plaintiff's claim. Dr. Lombardi's present diagnosis, which

would not have been before the Defendant at the time it made its determination, appears to be based entirely on Plaintiff's subjective complaints and the fact that no other cause for her complaints has been identified. The court is not aware of any medical tests that produce an objective measure of a person's fatigue. See Sisco v. United States Dep't of Health & Human Services, 10 F. 3d 739, 744 (10th Cir. 1993) (stating "there is no 'dipstick' laboratory test for chronic fatigue syndrome"). However, the terms of an ERISA plan are interpreted under the general principles of contract law and the terms are accorded their plain meaning in an ordinary and popular sense. Regents of the Univ. of Mich. v. Agency Rent-a-Car, 122 F. 3d 336, 340 (6th Cir. 1997). The Court "must give effect to the unambiguous terms of an ERISA plan." Lake v. Metropolitan Life Ins. Co., 73 F. 3d 1372, 1379 (6th Cir. 1996). The plan in this case specifically requires objective findings. In Yeager v. Reliance Standard Life Ins. Co., 88 F. 3d 376 (6th Cir. 1996), the court found it was not arbitrary and capricious for the defendant to require medical evidence of a physical condition or anatomic abnormality when no doctor could definitely diagnose plaintiff as having fibromyalgia even though the doctors did not doubt her subjective complaints of fatigue and joint pain. Id. at 381-382. As the court in Boardman v. Prudential Ins. Co. of Am., 337 F. 3d 9 (1st Cir. 2003), observed: "While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis." Id. at 16 n. 5; and see Nichols v. Verizon Communications, Inc., 78 Fed. Appx. 209, 2003 WL 22384772 (3rd Cir. 2003) (finding it was reasonable to require a claimant with CFS to provide objective tests demonstrating the existence of the claimant's CFS symptoms).

One symptom of CFS, in addition to fatigue, is muscle weakness or pain. After

completing physical therapy, Plaintiff showed a good increase in strength and endurance, and could walk 500. An examination in January 2002, showed 5/5 strength and normal tone and bulk, and she was walking normally. Thus, the severe, debilitating muscle weakness reported by Plaintiff is not supported by objective medical evidence. The Plaintiff has not pointed out to the court other symptoms associated with CFS, and in particular, other symptoms which are supported by objective findings.[2]

Plaintiff cites to Moon v. Unum Provident Corp., 2005 WL 664330 (6th Cir. (Mich), for the proposition that an administrator's decision is arbitrary and capricious where it rejects the treating physician's analysis without a reasoned explanation to support its conclusion. However, in Moon all of the plaintiff's treating physicians as well as the defendant's consulting physician agreed that the plaintiff had chronic and severe hypertension which was not susceptible to successful treatment, and which would prevent her from returning to work. The reviewing physician, who concluded the plaintiff was not disabled from sedentary work, depended upon a single blood pressure measurement while ignoring an abundance of medical evidence to the contrary. In this case, the Defendant did not ignore objective evidence, nor had any of Plaintiff's treating physicians stated that she was disabled from sedentary work.

Based upon the record, the court finds that Defendant's decision was not arbitrary and

---

[2] In reviewing cases addressing CFS it appears that an abnormal SPECT scan is a characteristic finding in patients with CFS, Friedrich v. Intel Corp., 181 F. 3d 1105, 1112 (9th Cir. 1999); and, CFS is accompanied by muscle weakness, sore throat, mild fever, tender lymph nodes, headaches and depression. Dornack v. Apfel, 49 F. Supp.2d 1129, 1131 (D.Minn. 1999) citing Dorland's Illustrated Medical Dictionary, p. 1627 (28th Ed.1994). Although there is evidence in the record of depression, Plaintiff's reported muscle weakness is not supported by objective evidence, and there is no objective or subjective evidence of a persistent sore throat, mild fever, tender lymph nodes or headache.

capricious.

Defendant's Motion to Strike Exhibit A to the Supplemental Brief of Plaintiff

Exhibit A to Plaintiff's supplemental brief is the letter dated April 29, 2005, from her treating physician, Dr. Lombardi.  The letter is in response to the court's order of March 30, 2005, permitting the parties to submit medical opinions pertaining solely to newly submitted evidence from the University of Michigan Neurological Department.  The letter contains Dr. Lombardi's present diagnosis, which is outside the scope of the court's order.  The diagnosis would not have been available to the Defendant at the time it made its decision, and was not considered by the court.  The letter additionally included information from the Center for Disease Control about CFS, indicating that CFS may have multiple causes, including viruses or other infectious agents.  The information appears to be in response to the statement of the doctors at the University of Michigan that Plaintiff's symptoms were consistent with CFS.  Because the information has some connection to the University of Michigan report, albeit tenuous, the concludes that the exhibit should not be stricken.

Conclusion

For the reasons discussed above, the court DENIES the Defendant's Motion to Strike Exhibit A to the Supplemental Brief of Plaintiff;  DENIES the Plaintiff's Motion for Judgment on the Merits, and GRANTS the Defendant's Motion for Judgment on the Merits.

So ordered this 15th day of June 2005.

                                              /s/ Wendell A. Miles
                                              Wendell A. Miles
                                              Senior U.S. District Judge